1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4      BUNGE, S. A.,                    )
                                        )
5                     Plaintiff,        )
                                        ) C.A. No. 22-26-RGA
6      v.                               )
                                        ) IN ADMIRALTY, Rule 9(h)
7      ADM INTERNATIONAL SARL,          )
                                        )
8                     Defendant.        )
                                        )
9      and                             )
                                        )
10     AMERICAN PETROLEUM TANKERS X LLC)
       ARCHER-DANIELS-MIDLAND COMPANY  )
11     ASHLAND SPECIALTY INGREDIENTS   )
       G.P. CROWLEY GLOBAL SHIP        )
12     MANAGEMENT,INC. MOSAIC          )
       FERTILIZER, LLC,                )
13                    Garnishees.      )
14
                                       J. Caleb Boggs Courthouse
15                                     844 North King Street
                                       Wilmington, Delaware
16
                                       Thursday, February 10, 2022
17                                     10:00 a.m.
                                       Oral Argument
18

19     BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

20     APPEARANCES:

21              YOUNG CONAWAY STARGATT & TAYLOR, LLP
                BY:  TIMOTHY J. HOUSEAL, ESQUIRE
22
                        -and-
23
                SIMMS SHOWERS LLP
24              BY:  J. STEPHEN SIMMS, ESQUIRE

25                              For the Plaintiff

```
 1    APPEARANCES CONTINUED:

 2              RAWLE & HENDERSON LLP
                BY:  JOELLE WRIGHT FLORAX, ESQUIRE
 3
                        -and-
 4
                SQUIRE PATTON BOGGS
 5              BY:  JOHN J. REILLY, ESQUIRE
                BY:  EMILY HUGGINS-JONES, ESQUIRE
 6
                              For the Defendant
 7
10:02:30
10:02:30  8              ***  PROCEEDINGS  ***

10:02:30  9         DEPUTY CLERK:  All rise.  Court is now in

10:02:31 10    session.  The Honorable Richard G. Andrews presiding.

10:02:38 11         THE COURT:  All right.  Please be seated.

10:02:44 12         This is the hearing in Bunge vs. ADM

10:02:49 13    International, Number 22-26.

10:02:56 14         When you're speaking, if you're fully vaccinated

10:03:01 15    and you want to take your mask off, you may.  So, why don't

10:03:08 16    we have the appearances for Bunge.

10:03:10 17         MR. HOUSEAL:  Good morning, Your Honor.  Tim

10:03:15 18    Houseal of Young Conaway Stargatt & Taylor on behalf of

10:03:18 19    Plaintiff, Bunge, S.A.  We call it Bunge in my office, but

10:03:23 20    I've been told by the client that it's, in fact, Bunge.

10:03:25 21         THE COURT:  Okay.

10:03:26 22         MR. HOUSEAL:  And with me today, Your Honor, is

10:03:28 23    my co-counsel Stephen Simms of the firm Simms Showers out of

10:03:32 24    Baltimore, Maryland, although he's returning home to

10:03:34 25    Delaware where he grew up.  He has been admitted pro hac
```

10:03:38 1 vice and has appeared before Your Honor in other maritime

10:03:41 2 matters.

10:03:42 3     THE COURT:  I've certainly seen his name on lots

10:03:44 4 of papers.  I don't know if I've actually seen you in

10:03:46 5 person.

10:03:48 6     MR. SIMMS:  Here I am.

10:03:49 7     MR. HOUSEAL:  He does exist, Your Honor.

10:03:51 8     THE COURT:  Thank you, Mr. Houseal.

10:03:52 9     All right.  For ADM?

10:03:56 10     MS. FLORAX:  Good morning, Your Honor.  Joelle

10:03:58 11 Florax of Rawle & Henderson on behalf of ADM.  I'm here

10:04:01 12 today with my co-counsel, Emily Huggins Jones and John

10:04:05 13 Reilly from the law firm of Squire Patton Boggs.  And

10:04:10 14 they've both been admitted pro hac vice by Your Honor in

10:04:15 15 this matter and they will be presenting our argument today.

10:04:17 16     THE COURT:  So, it's Mr. Huggins and Ms. --

10:04:20 17     MS. FLORAX:  Ms. Huggins.

10:04:22 18     THE COURT:  Oh, Ms. Huggins and Mr. Reilly.

10:04:25 19 Okay.

10:04:32 20     Okay.  Let me say that I have prepared for this

10:04:35 21 hearing and I have read basically all the briefing.  I've

10:04:44 22 read now five declarations because I got one this morning.

10:04:50 23 Two by Mr. Sarll and three by the two English lawyers for

10:04:56 24 ADM.  And I have read what I consider to be relevant cases.

10:05:09 25     So, I guess ADM is the one moving to vacate

10:05:15  1    this.

10:05:20  2                MR. REILLY:  Good morning, Your Honor.  I am

10:05:27  3    John Reilly.  I am fully vaccinated, Your Honor, and booster

10:05:33  4    shot, so I would prefer to speak without my mask and as you

10:05:35  5    invited us to do.

10:05:38  6                As you have heard, I'm here representing the

10:05:41  7    Defendant, ADM, in regards to the motion to vacate.  But

10:05:48  8    before we get to that, there are two housekeeping items that

10:05:51  9    I'd like to bring up.

10:05:55 10                We learned yesterday that Bunge has served a

10:06:04 11    writ of attachment on one of the garnishees garnishing ADM.

10:06:09 12    Now, that garnishee is the parent company of the company

10:06:13 13    that I represent in this litigation.  That garnishee, along

10:06:17 14    with the other garnishees, had been served with writs of

10:06:21 15    attachments emanating from the original Verified Complaint,

10:06:25 16    which has now been superceded by the First Amended

10:06:30 17    Complaint.

10:06:30 18                And our comments with respect to that service of

10:06:34 19    process yesterday are as follows.  One, we believe that the

10:06:39 20    old writs of attachments are void now that a new prayer has

10:06:45 21    been made to the Court for a new order of maritime

10:06:49 22    attachments.

10:06:50 23                Two, what was served on the garnishee ADM was

10:06:58 24    the old Verified Complaint as opposed to the new First

10:07:03 25    Amended Verified Complaint, the First Amended Complaint.

10:07:05  1          Three, Your Honor had extended the time for all

10:07:11  2   of the garnishees to respond until 21 days after a decision

10:07:18  3   on this motion or if Your Honor would decide to make that

10:07:23  4   date an earlier date.  So, it seems to me that the same

10:07:30  5   ruling should apply to this writ of attachment that was

10:07:33  6   served yesterday.

10:07:33  7          I did confer with counsel about that asking why

10:07:37  8   he had gone ahead and done it, and he explained, and I agree

10:07:40  9   with his explanation, that in order for a writ of maritime

10:07:45 10   attachment to be valid over an asset raise, there has to be

10:07:51 11   something in the account.  There has to be something there

10:07:53 12   when the writ is served.

10:07:55 13          So, for example, on January 13th if ADM owed us

10:07:59 14   money, and it's gone now, and now there's new money in, he

10:08:05 15   would -- it's true, he has to serve again.  But I do think

10:08:08 16   it's inappropriate to go ahead and serve while Your Honor's

10:08:12 17   order is outstanding and the technical aspects of the

10:08:19 18   service are improper in that it was the old complaint

10:08:22 19   instead of the new.  And it was the old writ instead of the

10:08:25 20   writ yet to be executed by this Court, issued by the clerk

10:08:29 21   on your Court's order.  So, I raise those points simply to

10:08:34 22   object to that.

10:08:37 23          Secondly, we learned today that one of the

10:08:43 24   garnishees has responded informally.  So, there are five

10:08:48 25   garnishees.  One of them is our parent, we just talked about

10:08:52 1    that.  Another garnishee is a company called Mosaic.  I

10:08:57 2    think it was Paragraph 17 in the First Amended Complaint

10:09:01 3    which describes a bit who these various garnishees are.

10:09:05 4    Evidently, the garnishee responded informally, as I say, to

10:09:10 5    counsel that it's holding 400, and I'm going to say 408,000.

10:09:15 6    I think that was the number, $408,000.

10:09:17 7          This is the first we've heard of it.  If that's

10:09:21 8    true, among other things, it would certainly, I think, moot

10:09:25 9    the first argument that I was about to present to Your Honor

10:09:28 10   which was the standing argument, because Bunge has made an

10:09:35 11   assertion that we have no standing to move to vacate the

10:09:40 12   maritime attachment.  They say because we are not

10:09:44 13   claiming -- because they read Rule 4 as saying motion to

10:09:50 14   vacate rule, pardon me, E(4)(f) of the supplemental rules,

10:09:55 15   they read that as saying, A party who is claiming an

10:09:59 16   interest in the attached in rem can bring a motion.  And

10:10:04 17   they said we didn't.

10:10:06 18         Now, we dispute that for reasons stated in our

10:10:09 19   brief, in our reply brief.  They cite two cases that we

10:10:14 20   think are totally inapplicable.  But according -- the point

10:10:17 21   I want to get to sooner rather than later is that now it

10:10:21 22   looks like they've attached $408,000 of our money that would

10:10:25 23   certainly render that first argument moot, in my view.  But

10:10:28 24   I'm absolutely prepared to go ahead and make our case as to

10:10:33 25   why we do have standing.

10:10:35   1          And I can tell you very quickly we have standing

10:10:39   2   because they're attempting to seize our property.  That's

10:10:42   3   what the prayer for relief says.  It says seize the property

10:10:45   4   of -- garnish the property of ADM in this district in the

10:10:50   5   hands of these five garnishees.  One of those garnishees

10:10:55   6   says, Yeah, I've got that.  I've got that.

10:10:56   7          The others, evidently, have not responded.  The

10:11:00   8   other four have not responded yet, but the response would

10:11:03   9   have to be in regard to property of ADM's, my client, ADM.

10:11:12  10   That clearly would make a claim to that property when we

10:11:14  11   find out what it is, if they grant anything.  Right now I

10:11:17  12   can tell you we're making a claim to the $408,000 that I

10:11:21  13   just heard of.

10:11:22  14          So, I think that the two cases that Bunge has

10:11:26  15   cited to support their position that we do not have

10:11:31  16   standing, one is a case where the Defendant, the ship was

10:11:38  17   arrested and seized.  So, the Defendant, you know, so, I do

10:11:41  18   not own that ship.  So, the Court held in that case that it

10:11:45  19   doesn't have standing.  He doesn't own the property.  He

10:11:47  20   doesn't have standing to move to vacate that.  Makes sense

10:11:50  21   to me.

10:11:51  22          The other one, garnishees came forward.  And the

10:11:56  23   garnishees said they moved to vacate, and the Court said,

10:12:00  24   Look, this is not your property.  It's not the garnishee

10:12:03  25   that moves to vacate.  It's got to be the owner of the

10:12:06  1   property or the person that has a claim to that property.

10:12:09  2   And that case makes sense to us, too.

10:12:11  3          But, in this case, where the somewhat loosely

10:12:17  4   described property of my client is trying to be -- they're

10:12:25  5   trying to garnish that, obviously, when they identify it, we

10:12:29  6   will claim it if it's ours as we claim the 408,000.  So,

10:12:34  7   I'll be happy to answer questions on that, but I think the

10:12:36  8   big issue in our motion today is the issue that the ripe --

10:12:43  9   the English counsel providing those affidavits are talking

10:12:47 10   about ripeness.  Our courts talk about ripeness.  We are

10:12:52 11   really claiming, and the case law supports our argument that

10:12:59 12   in order to allege a maritime, a valid prima facie maritime

10:13:06 13   claim, it has to be in regard to a claim that's justiciable,

10:13:14 14   that's capable of being enforced now at the time the motion

10:13:21 15   for the attachment is made.  It can't be something that is

10:13:26 16   half ready now and when something else happens down the

10:13:29 17   road, like, you know, what your damages are or the third

10:13:34 18   party who has a claim against the Plaintiff finally

10:13:38 19   prevails, or there's a settlement of that claim and when --

10:13:41 20   it can't wait for that.

10:13:42 21          And, Your Honor, with apologies, yesterday when

10:13:45 22   I was looking at these papers, I came across a case that I

10:13:49 23   should have remembered.  I sent it last night to counsel.

10:13:51 24   It's a case in 1965 in the Second Circuit.  It's Judge

10:13:58 25   Marshall, then Judge Marshall and he wrote an opinion, a

10:14:02  1    lengthy, detailed comprehensive analysis of an issue that

10:14:07  2    had to do with arbitration, not attachment.

10:14:11  3            I want to recite on the record, the Greenwich

10:14:18  4    Marine, the citation, which I will do here in a second.  And

10:14:22  5    what he held there and a very interesting decision -- thank

10:14:27  6    you.  Thank you.  It is -- well, Greenwich Marine against

10:14:35  7    the S.S. Alexandra decided September 24th.  And the citation

10:14:40  8    is 339 F.2d 901.  Decided September 1, '96 -- decided

10:14:50  9    January 1965.

10:14:51 10            So, in this somewhat detailed opinion that

10:14:56 11    involved maritime arbitration, not an attachment, but the

10:14:59 12    question was:  Could the maritime Plaintiff compel

10:15:04 13    arbitration?  And there was an indemnity claim.  It was an

10:15:09 14    indemnity claim, as they've identified here, as we think we

10:15:11 15    have here, and the judge, after thorough discussion, and the

10:15:17 16    Court, Second Circuit, they held, No, you do not have a --

10:15:22 17    when all it is is an indemnity claim that has not yet

10:15:28 18    matured, they use the word, they say, it's premature as

10:15:32 19    opposed to not ripe.  But they say when it hasn't matured so

10:15:37 20    that you have actual damages, and you can't actually enforce

10:15:41 21    it right now, that's not a justiciable maritime claim.  And

10:15:46 22    that's back in 1965.

10:15:47 23            And the case law has really evolved from that

10:15:51 24    point.  And it's become very relevant, become the issue in

10:15:54 25    the maritime attachment cases.  And if I may, just as a

10:15:59  1    general matter before we get into the detail, maritime

10:16:02  2    attachments are, I think it's fair to say, that they're

10:16:06  3    extreme remedies given to a maritime Plaintiff in

10:16:15  4    recognition of the fact that maritime law is a global

10:16:20  5    practice at least.  Maritime trade is a global trade.

10:16:25  6         You have vessels, and largely this involves

10:16:28  7    vessels coming into a port getting services in that port

10:16:32  8    from the local folks and in New York.  They put bumpers

10:16:36  9    aboard.  They provide piloting services.  They put food

10:16:39 10    aboard, things of that sort.  And the vessel runs and then

10:16:43 11    the vessel sails off.  And you know, what you can do to

10:16:46 12    secure a claim against the foreign entity.

10:16:49 13         So, these supplemental rules from maritime

10:16:54 14    procedure have been designed to give a maritime Plaintiff

10:16:58 15    some protection when you've got a maritime claim.  But there

10:17:02 16    are limits to that, of course.  And Judge Marshall in

10:17:08 17    Greenwich Marine recognized the limits with regard to

10:17:12 18    arbitration.

10:17:14 19         Judge Kaplan, you know, I think that counsel,

10:17:19 20    Mr. Sarll and in his affidavit as in the record, his

10:17:24 21    declaration, his first declaration, I think he's right to

10:17:28 22    focus on the Bottiglieri case, which is Judge -- which is

10:17:32 23    cited in both of ours.  And that's judge -- originally Judge

10:17:37 24    Kaplan's decision in the Southern District of New York, and

10:17:43 25    that his decision was affirmed by the Second Circuit.

10:17:45 1          And, again, it was what I'm calling an indemnity
10:17:49 2     claim.  You know, the English -- Mr. Sarll doesn't want --
10:17:53 3     you know, he's resisting the idea that there's an indemnity
10:17:57 4     claim.  Bunge, in this action, in this court, they call them
10:18:01 5     indemnity claims, and they are indemnity claims.  But Judge
10:18:05 6     Kaplan, when he looked at it, same basis factual narrative,
10:18:10 7     but when he looked, he said, Look, maybe you've got three
10:18:13 8     types of claims here.  You've got a regular contract claim
10:18:17 9     and then a second claim he didn't go into there.  What he
10:18:21 10    meant was the second claim would have been a contract claim
10:18:24 11    with an express indemnity provision, a contract claim.  And
10:18:28 12    in that contract, it says, I promise to indemnify the other
10:18:33 13    party for something.
10:18:34 14          So, you've got -- and then the third claim that
10:18:36 15    he focused on more was a, I wouldn't say a contract claim,
10:18:44 16    but an indemnity claim in the sense that it invoked a claim
10:18:49 17    relating to a third party's claim against the Plaintiff.
10:18:52 18    And he decided that that claim is not ripe.  You know, and
10:18:59 19    in so many words he said, it's not a justiciable maritime
10:19:03 20    claim under Rule B in U.S. federal maritime law.  That's
10:19:09 21    basically what he was saying.
10:19:10 22          And the Second Circuit, they're very -- and by
10:19:14 23    the way, what's I think there's a case -- that's after Aqua
10:19:18 24    Stoli, that's after some of these other cases that we've
10:19:21 25    been wrestling with in the briefs.  I think maybe the

10:19:24 1   most -- it's -- it's back in -- it's a while ago.  It's a

10:19:29 2   decade ago.  But the Second Circuit in a very brief decision

10:19:34 3   said, the District Court saw what they saw.  They analyzed

10:19:40 4   the English law, and he exercised his discretion.  They

10:19:45 5   said, Judge Kaplan for District Court has the discretion to

10:19:49 6   look at this and say, I do not think that this is ripe or

10:19:55 7   justiciable.  This is not ready to go yet; therefore, you

10:19:59 8   cannot get a maritime attachment under Rule B because you do

10:20:04 9   not have a justiciable maritime claim.

10:20:08 10          And that's really what that comes down to.

10:20:11 11   That's the sum and substance of everything that we're

10:20:14 12   talking about.

10:20:14 13          I'm not going to talk about Mr. Sarll's second

10:20:17 14   declaration, which has been stricken, but in his first

10:20:19 15   declaration as well, he spends a lot of time talking about

10:20:24 16   causes of action.  And it's not when the cause of action

10:20:29 17   arises, it's when an enforceable cause of action arises.

10:20:35 18          So, that's what counts here in the analysis.

10:20:41 19   So, we have submitted our -- you know, our two affidavits,

10:20:45 20   one from my partner, Mr. Rollason and he's handling the case

10:20:51 21   for ADMI in London.  And another from the English counsel in

10:20:55 22   London who's been retained by ADMI to represent him.

10:21:03 23          Mr. Rollason, in a declaration that was filed

10:21:06 24   when we filed our original motion to vacate Paragraph 9

10:21:11 25   lengthy paragraph, gets to that.  That's the meat of it,

10:21:14 1   that Paragraph 9.  And the last sentence or two in

10:21:18 2   Paragraph 9, he gets to the point.  He says, This is not --

10:21:22 3   and look, under English law, this is not a claim that can be

10:21:27 4   enforced.  You can't get security for it or enforce it.  The

10:21:30 5   important thing is you can't enforce it.  So, that's what he

10:21:33 6   says in Paragraph 9.

10:21:36 7          And by the way, Mr. Coldrick, the other English

10:21:42 8   counsel in his affidavit, he says, I agree with

10:21:45 9   Mr. Rollason.

10:21:47 10          What's important, I think, and significant here

10:21:49 11   is that in the one affidavit that's been in the record, I'm

10:21:55 12   happy to look at the second affidavit, Mr. Sarll never

10:21:58 13   disagrees.

10:21:59 14          THE COURT:  So, Mr. Taylor -- oh, Mr. Reilly,

10:22:02 15   sorry.  Under your view, when would it become ripe here?

10:22:14 16          In other words, let's assume that at some point

10:22:19 17   in the future there's an arbitration award against Bunge in

10:22:31 18   the London arbitration.  And then they come back here and

10:22:38 19   say, Okay.  Now, we've got an indemnity claim, and it's for

10:22:42 20   that amount of award.  You know, assuming the other things

10:22:46 21   are met, is that now a prima facie valid or admirability

10:22:53 22   claim?

10:22:53 23          MR. REILLY:  If that claim arose, I'd be back

10:22:55 24   before Your Honor and arguing that it's not, because I think

10:22:57 25   it has to be paid.  But I can see that apparently in London,

10:23:03  1    it just has to be enforceable in London.  But, you know, we

10:23:07  2    cite, for example, the Third Circuit case, not a maritime

10:23:11  3    case, the Schwinn case in Baltimore, 2020, I think.  And

10:23:15  4    they talk about what's justiciable.

10:23:17  5         You know, I think an indemnity claim, I've

10:23:20  6    always believed an indemnity claim is not justiciable until

10:23:25  7    the indemnity has paid the third party.  That's when it

10:23:31  8    becomes -- that's when you've got a real claim.

10:23:33  9         But it may be, from what they're arguing, that

10:23:37 10    in the U.K. under English law, the indemnity claim as soon

10:23:41 11    as it's enforceable that that's a -- and so does -- the

10:23:45 12    award when it's entered or a settlement is reached, then it

10:23:50 13    becomes enforceable.

10:23:52 14         THE COURT:  So, what's your view of the

10:23:53 15    interaction of, on the one hand, you have an attachment

10:23:58 16    garnishment procedure which is a U.S. law thing and you have

10:24:04 17    these contracts which are all supposed to be -- well, which

10:24:08 18    are all decided under English law.  The cases that support

10:24:14 19    your position, are they being decided as a matter of English

10:24:19 20    law, or are they being decided as a matter of U.S. law,

10:24:23 21    taking English law into account?

10:24:27 22         MR. REILLY:  Great.  I was about to say Judge

10:24:31 23    Kaplan's decision in Bottiglieri and the others seem to be

10:24:34 24    applying English law or trying to apply English law and

10:24:38 25    deciding whether there's an enforceable claim and,

10:24:42 1    therefore, being a valid maritime claim in the U.S.

10:24:45 2            I'm not sure that that -- but, in any event, the

10:24:51 3    cases so far are applying English law.  And the answer is I

10:24:58 4    don't know whether it's correct.  It -- maybe it should be

10:25:01 5    U.S. law because we're here.  And the -- whether you have a

10:25:04 6    claim under Rule B in the U.S. federal statutes, that seems

10:25:10 7    to me it should be a U.S. law issue.  But the cases do apply

10:25:18 8    English law.  But most of those English cases, most of those

10:25:22 9    cases say it's not enforceable, therefore, it's not

10:25:27 10   enforceable under English law, even under English law;

10:25:32 11   therefore, you're not entitled to a maritime attachment

10:25:35 12   under Rule B of the federal statute for maritime actions.

10:25:39 13           And --

10:25:40 14           THE COURT:  Is it a requirement for Rule B

10:25:43 15   attachment garnishment that there actually be a case in

10:25:48 16   front of a tribunal somewhere?  I think I know the answer to

10:25:51 17   this, but I want to make sure.

10:25:52 18           MR. REILLY:  If it had been settled, you know,

10:25:57 19   the -- you know, absent a settlement, no settlement, only a

10:26:03 20   claim, absolutely.  You would have had to have started the

10:26:07 21   arbitration and --

10:26:07 22           THE COURT:  No, no, no.  Think more broadly.

10:26:10 23   Let's assume, you know, that there's a party out there that

10:26:20 24   says the ship of some Delaware corporation bought, you know,

10:26:25 25   $400,000 of bunkers in St. Petersburg, and they say, You

10:26:31 1    didn't pay for it.  Can they file the garnishment action

10:26:37 2    here even though they haven't filed litigation anywhere to

10:26:40 3    try to collect this $400,000?

10:26:42 4                    MR. REILLY:  Yes.

10:26:42 5                    THE COURT:  Okay.  That's what I thought the

10:26:45 6    answer was.

10:26:46 7                    MR. REILLY:  And it happens all the time.  And

10:26:47 8    it's because that's the difference between an indemnity

10:26:51 9    claim and a mere non-payment claim.  They've got a right to

10:26:55 10   get paid right now.  They've submitted their invoice.  They

10:26:57 11   haven't been paid.  Absolutely, go ahead and seize the

10:26:59 12   vessel.

10:27:00 13                   I want to segue way into another point that's

10:27:06 14   part of this.  It's related to this, and I think it

10:27:09 15   illustrates what happens here.

10:27:10 16                   In London, in the arbitration in London, as I

10:27:14 17   understand it, Bunge's claim for something, 4 million or 8

10:27:18 18   million.  Now, they're asking for four, but they have a

10:27:21 19   claim in London against ADMI.  And most of that claim by far

10:27:30 20   arises out of the fact that they may be held liable to --

10:27:34 21   Bunge may be held liable to the shipowner.  We're held

10:27:38 22   liable to the shipowner.  You know, we're going to get it --

10:27:43 23   we're going to get -- pay ADMI who's liable to us.  That's

10:27:44 24   their point.

10:27:45 25                   Some of it, though, about $408,000 of that is

10:27:49  1    not that type of claim.  It's more like a direct claim.

10:27:55  2    It's a -- you know, they allege it is a direct claim against

10:28:01  3    ADMI.

10:28:02  4              Some of it is for loss of hire, you know.  So

10:28:05  5    Your Honor knows, the vessel goes into Mississippi.  It ties

10:28:11  6    up at an anchorage.  It has difficulties.  The anchors.  And

10:28:17  7    there's a lot of delay.  So, the vessel is put off hire.

10:28:23  8    And there are other expenses in trying to retrieve the

10:28:26  9    anchor, et cetera.

10:28:28 10              So, Bunge says, Hey, you've got to pay.  You

10:28:34 11    know, you chartered our vessel.  The vessel has certain

10:28:37 12    provisions as to what you pay.  You should not have put us

10:28:40 13    off hire.  You know, we have that claim against you and we

10:28:43 14    have a claim for some other items, $408,000.

10:28:47 15              And Bunge here in this Court is arguing, Look,

10:28:50 16    that's not an indemnity claim.  We argued in our first

10:29:00 17    motion to vacate that it's clearly derivative.  We have that

10:29:04 18    in a footnote.  We say --

10:29:05 19              THE COURT:  You say "derivative," but I got the

10:29:07 20    impression from your expert or from your London lawyer that

10:29:13 21    basically your argument is really it's contingent, too.

10:29:16 22              MR. REILLY:  Exactly, because of the way they

10:29:18 23    pled it.  You know, we say here they pled that they have an

10:29:22 24    indemnity claim.  They should be held to that.  There,

10:29:25 25    Mr. Sarll, who is the counsel, he has pled that $408,000

10:29:30 1   claim to the panel with a statement of a commitment.  He's

10:29:34 2   saying, Here's what we're going to do.  We're going to go

10:29:37 3   after the owner for that.  That's what we're doing first.

10:29:40 4   We're going after the owner.

10:29:42 5          We incurred those damages because the owner's

10:29:45 6   ship was unseaworthy, bad anchors, and they didn't navigate

10:29:51 7   properly, so we're going after the owner.  If we lose that,

10:29:54 8   then we're going to go after ADMI.

10:29:59 9          Now, that really brings it.  So, that brings it

10:30:02 10  back to a contingent.  It's a contingent claim.  They're

10:30:06 11  only asserting that claim against us, if they lose against

10:30:09 12  the owner.  It's exactly like an indemnity claim.

10:30:13 13         So, for that reason as well, we think that --

10:30:15 14  and we didn't know that until recently when we learned it

10:30:20 15  here.  And --

10:30:22 16         THE COURT:  Well, your lawyer partner in London

10:30:26 17  certainly knew whenever the claim was filed; right?

10:30:28 18         MR. REILLY:  He knew it.  It wasn't until we

10:30:30 19  finally asked him that question.  Right, exactly.

10:30:32 20         THE COURT:  So, I have a different question.

10:30:36 21  Let's assume Mosaic actually has $408,000 that's yours or

10:31:00 22  that's set in the garnishment, and let's assume that I say,

10:31:03 23  yeah, go ahead, garnish it.

10:31:08 24         What does Mosaic do with the $408,000?

10:31:12 25         MR. REILLY:  Evidently, under the case law, it

10:31:15  1    would be up to Your Honor.  They could either hold it.  They

10:31:18  2    could hold it and, you know, if we --

10:31:20  3             THE COURT:  So, they could hold it or they could

10:31:22  4    pay it in the registry of the Court?

10:31:24  5             MR. REILLY:  Or pay it to the Court.

10:31:26  6             THE COURT:  So, let's assume somewhere down the

10:31:27  7    road that it turns out Bunge's claims are invalid, are lost.

10:31:36  8    They don't win on for whatever reason.  Do they owe you

10:31:40  9    anything for holding on to your money or making it

10:31:44 10    unavailable to you for a period of time?

10:31:46 11             MR. REILLY:  You know, in these maritime

10:31:49 12    attachment cases, if it ultimately turns out that the

10:31:52 13    attachment was improper, the party claiming interest to the

10:31:57 14    property that was attached could have a claim for wrongful

10:32:01 15    attachment.  But they're tough claims.  They're very tough.

10:32:06 16    They're made, and you would have to show some real -- if it

10:32:12 17    was not abuse of process, it's a pretty high standard to win

10:32:16 18    a claim for damages based on wrongful attachment.

10:32:20 19             THE COURT:  And the damages you would get, is it

10:32:22 20    more than just, you know, prime rate interest on the

10:32:27 21    $408,000, give or take, or, you know, could it be,

10:32:33 22    therefore, we couldn't buy a new boat, and therefore, we

10:32:37 23    didn't make $6 million chartering that boat?

10:32:39 24             MR. REILLY:  I mean, clever Plaintiff's counsel

10:32:41 25    could devise, you know, additional claims and attorneys'

10:32:44  1    fees.  You're always looking for attorneys' fees.

10:32:47  2             THE COURT:  Is there a basis for that in

10:32:51  3    admiralty law?

10:32:52  4             MR. REILLY:  Well, if it was a wrongful

10:32:53  5    attachment, and the Defendant had to come in and defend and

10:32:56  6    then prove it was a wrongful attachment, yes, I think

10:33:00  7    attorneys' fees would be appropriate in admiralty.

10:33:03  8             THE COURT:  All right.  This is a question that

10:33:05  9    I would primarily ask of the Bunge people, but perhaps you

10:33:11 10    know this.  So, this arbitration that's filed in 2019,

10:33:17 11    that's more than two-and-a-half years ago.  As I understand

10:33:23 12    it, the claims in the alternative were filed in 2019 by

10:33:34 13    Bunge.

10:33:35 14             Has something happened?  You know, what's the

10:33:40 15    cause two years later of all of a sudden trying to garnish

10:33:43 16    stuff?

10:33:43 17             MR. REILLY:  Well, we were wondering that, and

10:33:45 18    it seems -- respectfully, it's because more recently than

10:33:48 19    that, there's been a settlement.  So, the owners --

10:33:53 20             THE COURT:  Oh, the Louisiana settlement?

10:33:55 21             MR. REILLY:  Yeah.  So, now they've got the

10:33:57 22    numbers, and so they're cranking up the arbitration in

10:34:01 23    London and getting to it.

10:34:03 24             THE COURT:  Okay.  Is that the reason, because I

10:34:07 25    don't know and I'm not one to speak, but I thought

10:34:12  1    arbitrations were generally fairly speedy affairs.  At least

10:34:17  2    that was --

10:34:18  3             MR. REILLY:  Yeah, they are in the U S, I think,

10:34:20  4    my experience is.  But in London, in addition to this, the

10:34:25  5    unique problem here that they're looking for, the damages,

10:34:28  6    it takes a long time to get a hearing.  These London

10:34:31  7    arbitrators who are well known and in great demand, you

10:34:35  8    appoint them, but you have to get dates when they're

10:34:38  9    available.  That takes a while.

10:34:39 10             So, I think --

10:34:39 11             THE COURT:  And I think you said or somebody

10:34:42 12    said in the briefing that there's no particular schedule in

10:34:45 13    this arbitration?

10:34:47 14             MR. REILLY:  I didn't see that.  Well, I mean,

10:34:50 15    there's nothing wrong with -- the arbitrators are willing to

10:34:52 16    let it go on as they are usually until some event happens

10:34:57 17    that they can do that.  There's no statutory provision

10:35:02 18    compelling a certain schedule or anything like that that I'm

10:35:05 19    aware of.  That's English law.

10:35:08 20             THE COURT:  Okay.  I didn't see anything in the

10:35:21 21    expert affidavits or the briefing that offered any opinion

10:35:28 22    as to whether there's some English law equivalent to allow

10:35:33 23    one go-around seizing assets.

10:35:38 24             Am I right that there's actually nothing in the

10:35:40 25    record about that, first question?

10:35:44 1          And second question:  If I am right about that,

10:35:48 2    does that have any impact on what I'm supposed to be doing

10:35:51 3    here?

10:35:53 4          MR. REILLY:  Well, I think, ultimately, Your

10:35:55 5    Honor has a lot of discretion here.  That's number one.

10:35:58 6          But, you know, Mr. Sarll did go in quite a bit

10:36:02 7    to the so-called freezing.

10:36:03 8          THE COURT:  Right, but I understand that --

10:36:05 9          MR. REILLY:  Right.

10:36:06 10          THE COURT:  -- based on your expert's response

10:36:08 11    and then Mr. Sarll's -- yeah, I think -- sorry, I'm used to

10:36:13 12    the expert being Dr. Somebody or another.  Mr. Sarll's

10:36:16 13    response this morning that the freezing injunction is quite

10:36:20 14    a different sort of beast.  I mean, it's --

10:36:22 15          MR. REILLY:  Yes, yes.  They also have some -- I

10:36:25 16    shouldn't even mention, but they have something called a

10:36:28 17    Mareva injunction.  I'm not quite sure what that does

10:36:30 18    whether it's -- it may have nothing to do with this.

10:36:34 19          THE COURT:  All right.

10:36:34 20          MR. REILLY:  So, the answer, again, is I don't

10:36:36 21    know.

10:36:36 22          THE COURT:  Okay.  All right.

10:36:44 23          So, why don't I give Mr. Simms a chance to

10:36:47 24    respond to what you've said because I think you've covered

10:36:50 25    most of the topics I'm interested in.

10:36:56 1                    Wait a second.  Okay.

10:37:00 2                    Yeah.  Why don't I hear from Mr. Simms.

10:37:03 3                    MR. REILLY:  Thank you, Your Honor.

10:37:07 4                    MR. SIMMS:  Your Honor, we have a classic

10:37:20 5     English swearing contest here.  And so, we are talking about

10:37:25 6     English law.  That is what controls.  And also, what gets us

10:37:31 7     here is the Federal Arbitration Act which is 9 U.S.C.

10:37:36 8     Section 1, specifically Section 8, that allows for security

10:37:43 9     in an arbitration, in maritime arbitrations.  And so, you

10:37:48 10    asked, you need a preexisting cause of action.  In that

10:37:53 11    case, we've got the arbitration which has been, as you

10:37:58 12    pointed out, going on for quite a while.  The claim in

10:38:06 13    arbitration, and this is at Paragraph 12 of our -- of the

10:38:12 14    Bunge First Amended Complaint is for damages.  And that's

10:38:16 15    what Mr. Sarll points out, damages under English law.

10:38:21 16                   And when you look at the claim under English

10:38:27 17    law, there is a claim for damages.  There is a ripe claim,

10:38:31 18    and Mr. Sarll presents the case law on that.

10:38:34 19                   THE COURT:  Well, you say "ripe," my impression

10:38:38 20    was that Mr. Sarll said somewhere in there that ripeness

10:38:43 21    isn't really an English law concept.

10:38:45 22                   MR. SIMMS:  That's right.  That's what he said.

10:38:47 23    Yes, he said if you've got enough to make a claim, which we

10:38:52 24    do, which we have, then there is a cause of action under

10:38:56 25    English law.  He said that if there were no arbitration,

10:39:02  1   Bunge could go into the high Court, plead a cause of

10:39:06  2   action -- would have a cause of action that would be

10:39:08  3   recognized.  And so, under English law, there is a claim.

10:39:14  4            And, of course, there is a claim right here at

10:39:16  5   arbitration for indemnity and or damage for the losses set

10:39:24  6   out in those four subparagraphs.

10:39:28  7            THE COURT:  But I think you'd agree, wouldn't

10:39:30  8   you, that what is called under English law doesn't

10:39:37  9   necessarily mean that I have to call it the same thing under

10:39:42 10   American law?

10:39:44 11            MR. SIMMS:  Because English law controls, that's

10:39:47 12   what the Court looks at.  And the cases that the ADMI side

10:39:54 13   cited, that is, that look to English law, draw that same

10:39:59 14   conclusion.  They say, Well, we have a charter party.

10:40:02 15   English law controls.  We have to decide now what English

10:40:07 16   law says about this cause of action.  Is there a cause of

10:40:12 17   action?  Is it for damages?

10:40:14 18            Not American law.  American law is not pertinent

10:40:18 19   here.

10:40:19 20            THE COURT:  Well, I think it is because it's an

10:40:21 21   American, you know, supplemental rule.  Rules of admiralty,

10:40:28 22   that's American law.

10:40:29 23            MR. SIMMS:  There's an interesting set of cases,

10:40:33 24   and this has ranged back and forth on whether Ford freight

10:40:37 25   contracts controlled by English law could be the subject of

10:40:42  1    maritime attachment in the U.S.  I can send the Court the

10:40:47  2    ultimate Second Circuit decision that said, yes, you know,

10:40:50  3    not under American law, but we look to English law because

10:40:53  4    that's what controls the contract.  Therefore, this is a

10:40:57  5    maritime contract, Ford freight contracts.

10:41:00  6            Same thing, the first stop is:  Does the

10:41:03  7    contract that's involved, the contract between Bunge and

10:41:08  8    ADMI which has English law, control?  The Court then looks

10:41:14  9    to that English law and says, because U.S. Courts, where

10:41:21 10    there's sufficient connection between the parties, which

10:41:24 11    there is, and the law of choice will honor choice of law

10:41:29 12    clauses, the Courts look to that choice of law.

10:41:33 13            THE COURT:  I don't think there's any dispute

10:41:34 14    that English law applies.  What that actually might mean is

10:41:37 15    a different thing, but there's no argument that these

10:41:41 16    contracts are not to be decided by English law.

10:41:45 17            MR. SIMMS:  Yes.  And there's another point

10:41:50 18    about English law and the arbitration procedure.  The London

10:41:53 19    Society of Maritime Arbitrators, London arbitration is

10:41:57 20    expensive.  And English law provides for fee shifting.  And

10:42:03 21    so, Bunge already has laid out money in its proceedings

10:42:10 22    against ADMI, which is subject to being secure.  That is

10:42:17 23    what we have also requested as security in the Second

10:42:24 24    Amended Complaint.

10:42:25 25            THE COURT:  First --

10:42:26 1          MR. SIMMS:  We put in at least 500,000.  So,

10:42:38 2     that is an element of security.  Bunge has already paid out

10:42:46 3     money to arbitrators, not -- well, I think to arbitrators.

10:42:49 4          THE COURT:  So, you say it's in the complaint.

10:42:52 5     Which complaint are you talking about?

10:42:53 6          MR. SIMMS:  This is both in the first and the

10:42:55 7     second.  We -- the second, we put in.  This is at the prayer

10:43:02 8     for relief, Page 6, the Amended Complaint.

10:43:05 9          THE COURT:  I see.

10:43:05 10         MR. SIMMS:  Further amount for accrued and

10:43:09 11    accruing interest, also attorneys and arbitrators' fees of

10:43:09 12    at least $500,000 in security.

10:43:14 13         THE COURT:  Right.

10:43:15 14         MR. SIMMS:  So, that's real money that has been

10:43:22 15    incurred in this claim, but and fees shifted under English

10:43:28 16    law applied in the charter law.  So, the question comes down

10:43:35 17    to:  Is this a contingent thing?  That is, if I walked into

10:43:43 18    court, and I'm thinking of an opinion we, I remember

10:43:50 19    receiving, both sides, where a judge in Seattle a couple

10:43:57 20    months ago said, Well, both of you are claiming against each

10:44:00 21    other for a declaration, but this isn't ripe.  It's not ripe

10:44:04 22    because the thing you want the declaration about is whether

10:44:08 23    or not you want to pay the Government.  But the Government

10:44:10 24    hasn't assessed any damages, so you have no cause of action

10:44:12 25    under American law.  Okay.

10:44:14  1          But that's not this.  Looking to English law,

10:44:18  2   there is a cause of action.  Whether it's a pleading in the

10:44:23  3   high court, and Mr. Sarll used the freezing injunction as an

10:44:29  4   example.  Now, a freezing injunction, you also need to be

10:44:32  5   able to show -- there's a couple of elements.  The one

10:44:38  6   element that's not at issue here is:  Is there enough money

10:44:40  7   to satisfy the arbitration?  That's not an issue.  He just

10:44:46  8   used that as an example to say, yes, you know, step one,

10:44:49  9   there is a cause of action.  So, there could be that first

10:44:52 10   step shown to meet the freezing injunction.

10:44:58 11          As a matter of fact, under another example,

10:45:00 12   English law for in rem action, he cites the English statute

10:45:06 13   that says, yes, there's -- where you have a liability like

10:45:11 14   this one, a breach of contract, which we say Bunge has done,

10:45:15 15   breached the contract, yeah, or ADMI has, there is the right

10:45:21 16   of in rem action.

10:45:23 17          Okay.  Both analogies, English law.

10:45:30 18          The couple of cases, English law cases that ADMI

10:45:36 19   cited involve something called an Inter-Club Agreement for

10:45:40 20   cargo damage.  And that's not involved here.  That's a

10:45:44 21   completely different issue.  Basically, that's where the

10:45:50 22   marine insurance involved have said, okay, we agree that

10:45:53 23   we're going to put off resolution of questions like this

10:45:56 24   until certain things happen.  This isn't an Inter-Club case.

10:46:01 25   It is a breach of contract case.

10:46:11  1        Let's see.  Let me get to the question of

10:46:14  2  standing.  The exact number that Mosaic is holding is

10:46:19  3  $402,325.64.  The reason that you need to serve maritime

10:46:29  4  garnishment writs continuously, and this is what we put in

10:46:34  5  the order, what we put in our orders for relief is that the

10:46:39  6  garnishment writs only capture what's being held on the day

10:46:44  7  that the writ is served.  So, they're not continuous unless

10:46:48  8  then the garnishee says, Yeah, it's okay.  It can be

10:46:52  9  continuous.  So, that's why ADM got another writ.

10:46:58 10        This is an interesting question.  So when we all

10:47:03 11  first met, Mr. Reilly and I first met, I said, Okay, this

10:47:08 12  isn't hard.  Tell me if anything has been caught with ADM or

10:47:15 13  anybody else, and then there's no issue because you have no

10:47:20 14  Rule E(4)(f) claim.  You're not claiming to any property.

10:47:24 15  There's no property that's been seized.  So, we don't have

10:47:27 16  to do anything if there's nothing there.

10:47:30 17        And this is exactly what, you know, the

10:47:35 18  challenge of Rule B is all about, which is you're never

10:47:40 19  going to have the counterparty say, Oh, yes, we have a

10:47:42 20  contract that is coming due on this date for this amount for

10:47:47 21  this particular cargo.  And, oh, yeah, make sure you put in

10:47:53 22  there that it's the color green.

10:47:57 23        It's never going to happen.  And so, is there as

10:48:03 24  to the other writs other than Mosaic's a cause of -- that is

10:48:10 25  a Rule E(4)(f) right of hearing, well, I don't think

10:48:19 1    anything has been claimed.  The statute is very clear.  And

10:48:21 2    also Rule E(4)(f) hearings are not to be full evidentiary

10:48:26 3    hearings.  It's just to examine the factors of Rule B, all

10:48:31 4    of which are met here.  And really, the only one we've got

10:48:36 5    that's anywhere at all fuzzy is whether there is a maritime

10:48:43 6    claim.

10:48:43 7         And there is.  Under English law, it's a claim

10:48:47 8    for damages.  It's a maritime claim.

10:48:49 9         THE COURT:  So, Mr. Simms, ADMI cited various

10:49:00 10   U.S. federal cases purporting to decide fairly similar

10:49:06 11   issues.  And from what I could tell in your brief, you said

10:49:14 12   nothing about them.  And as far as I could tell from your

10:49:19 13   brief, you cited no cases deciding the similar issue

10:49:25 14   differently.

10:49:26 15        Am I right?

10:49:29 16        MR. SIMMS:  The reason, first, that the

10:49:31 17   American -- the cases only dealing with American law aren't

10:49:35 18   applicable, so that's why we didn't address those.  The

10:49:39 19   cases involving English law are not this case.  And that's

10:49:44 20   why -- and Mr. Sarll looks at the closest one, which is we

10:49:49 21   did talk about the Bottiglieri case.  And he looks at that,

10:49:53 22   and he says, the way that they looked at the law is wrong.

10:49:59 23   Not this case.  This is a damages case.

10:50:02 24        And so, that was the way that the only nearby

10:50:08 25   case was distinguished.  We had an English lawyer barrister

10:50:14 1  look at that case and say, No, it's not English law.  That's

10:50:17 2  what the Court has to consider.

10:50:18 3          THE COURT:  But in your actual brief, you didn't

10:50:20 4  address it; right?

10:50:21 5          MR. SIMMS:  Through Mr. Sarll's affidavit.  What

10:50:24 6  I say writing about English law doesn't matter.  And so, as

10:50:28 7  we got the motion to vacate coming in, what I said was --

10:50:34 8          THE COURT:  Well, no, what you say does actually

10:50:37 9  matter because you're an American lawyer, and the cases that

10:50:41 10 are out there are American cases.  Mr. Sarll's opinion about

10:50:46 11 American cases, while I'm sure relatively intelligent, are

10:50:52 12 not of an American lawyer reading the cases.  So, you know,

10:50:57 13 I'm not being -- you know, my only point is that in the body

10:51:05 14 of your brief, you really did nothing to advance your

10:51:09 15 argument.

10:51:11 16         MR. SIMMS:  What we did was submit Mr. Sarll's

10:51:21 17 affidavit.  Let me give you my thinking on this.  Okay.

10:51:27 18 These are American cases that are purporting to look to

10:51:32 19 English law.  Okay.  They're not saying -- their -- the only

10:51:38 20 American law exit that they passed was we'll apply a choice

10:51:44 21 of law clause.

10:51:46 22         And then, finding that English law applies, then

10:51:51 23 the American lawyers and American judges are trying to apply

10:51:56 24 under Rule 44.1 what English law says.  And so, for me to

10:52:03 25 say what an American Court says about English law isn't

10:52:07 1   helpful.  What's helpful is for the barristers to come to

10:52:10 2   you and say, This is English law as it applies to this case.

10:52:15 3   I hope that makes sense.

10:52:18 4              THE COURT:  All right.

10:52:19 5              MR. SIMMS:  And under Rule 44.1, the Court can

10:52:23 6   take any source it wants to make a decision that is under

10:52:30 7   that foreign law.  So, if the Court wanted to go dive into

10:52:37 8   the Lexis database of High Court opinions --

10:52:40 9              THE COURT:  Yeah, not something I want to do.

10:52:42 10             MR. SIMMS:  Yeah, I understand.

10:52:44 11             THE COURT:  So, I saw you nodding your head at

10:52:52 12  various times when I asked questions of Mr. Reilly, so I

10:52:57 13  think I know your answers to this.  But the reason why this

10:53:01 14  is being filed now two-and-a-half years after something was

10:53:06 15  filed in the London arbitration is because of the settlement

10:53:11 16  in Louisiana?

10:53:13 17             MR. SIMMS:  Yes, and we have that in the

10:53:15 18  complaint.  That is, it doesn't say we're filing this now

10:53:18 19  because of this, but we --

10:53:21 20             THE COURT:  Okay.  Well, no, no.  You don't need

10:53:23 21  to justify it.  That makes sense to me.

10:53:25 22             MR. SIMMS:  It's Paragraph 11.

10:53:27 23             THE COURT:  All right.  So, different question.

10:53:32 24  Let's assume that I vacate the Rule B attachments and

10:53:37 25  garnishment, really.  Does it follow then that I just

10:53:42 1   dismiss the case in its entirety?

10:53:44 2            MR. SIMMS:  No.  The case is open.  It is a case

10:53:50 3   that has a summons issued.  We would serve ADMI in

10:53:58 4   Switzerland.  ADMI would come back and respond what they

10:54:00 5   respond.

10:54:01 6            THE COURT:  Well, but if I vacate the

10:54:05 7   Garnishment Order, then there's nothing to serve; right?

10:54:06 8            MR. SIMMS:  There is a summons to serve.

10:54:11 9            THE COURT:  Well, that's only assuming the case

10:54:13 10  stays alive.  It's kind of circular.

10:54:15 11           MR. SIMMS:  Correct.  The case will stay alive,

10:54:18 12  and it needs to stay alive and here's why.  Rule B requires

10:54:23 13  two prongs to be met.  One is that there's no resident agent

10:54:30 14  in the district for service of process.

10:54:31 15           THE COURT:  No, right.  But I'm saying if

10:54:33 16  there's no prima facie valid maritime claim, why would the

10:54:38 17  case stay alive?

10:54:40 18           MR. SIMMS:  Well, first, there hasn't been a

10:54:48 19  motion to dismiss.

10:54:50 20           THE COURT:  All right.  So, I'm thinking ahead

10:54:53 21  here.

10:54:53 22           MR. SIMMS:  Yeah.

10:54:54 23           THE COURT:  Because if I vacate the Garnishment

10:55:01 24  Orders, what's left?

10:55:05 25           MR. SIMMS:  Well --

10:55:06  1                    THE COURT:  And why shouldn't I dismiss the

10:55:08  2      case?

10:55:09  3                    MR. SIMMS:  The reason the Court shouldn't

10:55:12  4      dismiss the case is, first, if there's a motion to dismiss

10:55:18  5      and it's granted, then we do take it up to the Third

10:55:21  6      Circuit.  I'm not quite sure how --

10:55:23  7                    THE COURT:  If I dismiss it after giving you a

10:55:25  8      chance to tell me why I shouldn't dismiss it, you can still

10:55:28  9      take it up to the Third Circuit.

10:55:30 10                    MR. SIMMS:  I understand.  And the other reason,

10:55:34 11      though, is because of Rule B. You asked Mr. Reilly, well,

10:55:38 12      what, you know, in your opinion, is going to make it a

10:55:42 13      proper Rule B case, and so the answer was, well, Bunge pays

10:55:46 14      money.  Okay.

10:55:47 15                    THE COURT:  But that is something that would

10:55:50 16      happen in the future whether it's winning in an arbitration.

10:55:54 17      And so, you could re-file the case if you actually get, you

10:56:00 18      know, a valid maritime claim.

10:56:06 19                    MR. SIMMS:  Well, what likely would happen is

10:56:09 20      that back to the requirement of Rule B, the requirement is

10:56:14 21      that there not be a resident agent for the district in which

10:56:17 22      it's processed and that there is no sufficient inpersonam

10:56:24 23      jurisdiction.  That is, it's --

10:56:26 24                    THE COURT:  Right, right.  I think the other

10:56:28 25      requirements we're not arguing about.

10:56:30 1    MR. SIMMS:  Right.  And so, what frequently

10:56:33 2 happens when there are Rule B cases that are dismissed for

10:56:36 3 whatever reason is there you go.  It's time to file again,

10:56:40 4 and you go up to the Delaware corporation's cite and there's

10:56:45 5 a resident agent appointed.  And so, the case needs to stay

10:56:52 6 open so that we can serve when -- if the Court says we're

10:56:57 7 not there.

10:56:58 8    THE COURT:  Well, if we take the premise that

10:57:00 9 you served, filed this case prematurely and that events on

10:57:06 10 the ground change when it's not premature, why is there

10:57:10 11 anything unfair about having the rules that are in place at

10:57:14 12 the time?

10:57:14 13    MR. SIMMS:  Boy, I don't know the answer to that

10:57:36 14 one.  What needs to be preserved is Bunge's right under the

10:57:46 15 Federal Arbitration Act to get security for this

10:57:48 16 arbitration.  And if the case is totally dismissed, I guess,

10:57:53 17 you know, then we would wait for there to be a remand or

10:57:58 18 something.

10:58:00 19    But let's say we get up to the Third Circuit and

10:58:03 20 the Third Circuit says, Yeah, you're right.  It should have

10:58:06 21 been dismissed.  Then we'd have to file a new case and there

10:58:11 22 would be a resident agent.

10:58:13 23    THE COURT:  And what is the bad thing about if

10:58:15 24 there's a resident agent?

10:58:17 25    MR. SIMMS:  There can't be a Rule B.

10:58:19  1            THE COURT:  So, but you still have all these

10:58:21  2      Delaware corporations.  Does that mean you cannot any longer

10:58:27  3      do anything to collect debts that they owed to ADMI?

10:58:33  4            MR. SIMMS:  What would happen is that if there

10:58:42  5      was a final arbiter award, it would be brought back here and

10:58:51  6      recognized.  And there would be a post-judgment attachment

10:58:58  7      that is on a --

10:58:59  8            THE COURT:  And isn't post-judgment attachment

10:59:04  9      roughly the equivalent of what's going on now?

10:59:07 10            MR. SIMMS:  It would be, yeah.

10:59:14 11            THE COURT:  So, okay.  All right.

10:59:23 12            So, I do have -- well, go ahead.  You have some

10:59:26 13      further thought.

10:59:27 14            MR. SIMMS:  Sure.  The question -- I think at

10:59:33 15      the very least, there are much more complicated questions of

10:59:38 16      English law here that might be treated in a E(4)(f) here.

10:59:46 17      And if the Court says, Well, you know, I think there's a

10:59:49 18      doubt, then there ought to be more briefing on the issue.

10:59:55 19            But, at an E(4)(f) stage, the writs ought to be

11:00:01 20      maintained.

11:00:04 21            THE COURT:  I'm sorry, is that an E(4)(f)

11:00:06 22      hearing that we're having right now --

11:00:08 23            MR. SIMMS:  Yes.

11:00:09 24            THE COURT:  -- because I'm not as conversant

11:00:12 25      with the subparts and which letters and numbers go with.  I

11:00:15  1    know we're having a hearing pursuant to the rules because I

11:00:18  2    looked at the rules at the time that I got the motion.

11:00:20  3                    MR. SIMMS:  Yes.

11:00:22  4                    THE COURT:  But, okay.

11:00:22  5                    MR. SIMMS:  E(4)(f), and that's whenever

11:00:29  6    property is arrested or attached, any person claiming an

11:00:32  7    interest in it shall be entitled to a prompt hearing.

11:00:39  8                    THE COURT:  Right.

11:00:40  9                    MR. SIMMS:  And then the case law on that is

11:00:42 10    that this hearing is -- it's not considered a full trial.

11:00:46 11    It's considered to be a preliminary showing which is what

11:00:50 12    Bunge is doing here saying, Yes, we have an English

11:00:54 13    barrister opinion that says, This is a damages case.  It's a

11:00:59 14    live case.  English law applies, which everybody agrees to.

11:01:02 15    That meets the E(4)(f) standard.

11:01:06 16                    And if the Court says, Well, all right, I think

11:01:08 17    we need more briefing on this, the Court can say that, too,

11:01:16 18    including getting live testimony from English barristers.

11:01:19 19    We need to see that evidence.

11:01:25 20                    THE COURT:  All right.  Do you have anything

11:01:26 21    else you want to say?

11:01:35 22                    Well, actually, let me just go back because

11:01:37 23    you're talking about the $402,000 of Mosaic.  You know, in

11:01:42 24    the briefing, you did say there's no standing.  Is that an

11:01:47 25    argument you're still pursuing?

11:01:49  1              MR. SIMMS:  Not for Mosaic.

11:01:52  2              THE COURT:  Okay.

11:01:52  3              MR. SIMMS:  But for the others, yes.  Now, if

11:01:55  4    the ADMI side were to stand up and say, yes, as a matter of

11:02:00  5    fact, and we know this because Archer-Daniels-Midland is our

11:02:03  6    parent, you've caught something over a dollar, then there's

11:02:13  7    standing to challenge that writ.  But not the -- but,

11:02:17  8    otherwise, there's no claim to anything.

11:02:18  9              THE COURT:  Well, so, in other words, let's

11:02:20 10    assume for the sake of argument that I vacate the Mosaic

11:02:25 11    garnishment.  Does that mean that I'd have another hearing

11:02:29 12    every time somebody reports back to you that they've got

11:02:31 13    some money?

11:02:34 14              MR. SIMMS:  If you vacated the Mosaic

11:02:38 15    garnishment, then I would think that decision would apply to

11:02:41 16    other garnishments.

11:02:45 17              THE COURT:  All right.  So, in other words, if I

11:02:49 18    vacated the one, you know, maybe the Third Circuit would be

11:02:53 19    a visit, but you're not going to be trying to garnish the

11:03:03 20    other things as long as it's based on the same theory as the

11:03:07 21    one that I've rejected with Mosaic?

11:03:09 22              MR. SIMMS:  No, there wouldn't be any point.

11:03:14 23    Yeah.  And since the -- I think the issue we're focusing on,

11:03:19 24    it focused on is English law.  All the other issues are not

11:03:23 25    issues any more.

11:03:24  1                    THE COURT:  So, under English law, if

11:03:27  2   Archer-Daniels-Midland International or some other portion

11:03:33  3   of maybe, or somebody else who owed a debt to ADMI was in

11:03:44  4   England, could you go out and do something equivalent to

11:03:48  5   this in England?

11:03:50  6                    MR. SIMMS:  You can get, Mr. Reilly referred to

11:03:55  7   this, a -- it's called an Mareva, Mareva injunction.

11:04:01  8                    THE COURT:  All right.  And what is that?

11:04:03  9                    MR. SIMMS:  It's basically the English version

11:04:06 10   of Rule B except that it requires a bond for twice the

11:04:10 11   amount of the claim.  But --

11:04:13 12                    THE COURT:  So, in other words, if you had a

11:04:14 13   claim for maybe $3.2 million, before you could go around

11:04:20 14   seizing ADM property, you'd have to post a bond of $6.4

11:04:25 15   million?

11:04:25 16                    MR. SIMMS:  Correct.  That's English law, but

11:04:30 17   not American law.  Because there's a difference between the,

11:04:36 18   what's the word, lex fori and lex whatever it is, the choice

11:04:40 19   of law.  So, that's the difference here.

11:04:45 20                    The other thing that Mr. Sarll referred to is a

11:04:49 21   freezing injunction --

11:04:50 22                    THE COURT:  Right.

11:04:51 23                    MR. SIMMS:  -- which are really effective, but

11:04:53 24   ultimately ADMI has money.  So if we went to Court in

11:05:00 25   England asking for a freezing injunction, they'd say, Are

11:05:02  1    you kidding?  It's Archer-Daniels-Midland.

11:05:09  2             THE COURT:  And it does seem kind of odd to me,

11:05:20  3    though a lot of things in the law that are odd, that on the

11:05:25  4    basis of English law, you're claiming a remedy, or remedy

11:05:34  5    may not be the right word, but it wouldn't be available to

11:05:38  6    you in England, but you say is available to you here.

11:05:42  7             MR. SIMMS:  And that's what the Federal

11:05:46  8    Arbitration Act provides for.  And there are arbitrations in

11:05:50  9    Singapore.  There are the same, basically same law under

11:05:54 10    Singapore law.  They have their version of a Mareva

11:05:58 11    injunction, but because of the Federal Arbitration Act,

11:06:03 12    there can be security here for that arbitration.

11:06:08 13             THE COURT:  Okay.  Anything else you wanted to

11:06:17 14    bring to my attention?

11:06:19 15             MR. SIMMS:  No, sir.

11:06:20 16             THE COURT:  Okay.  Thank you, Mr. Simms.

11:06:22 17             MR. SIMMS:  You're welcome.

11:06:24 18             THE COURT:  Mr. Reilly, anything further from

11:06:25 19    you?

11:06:27 20             MR. REILLY:  Yes, Your Honor, just a few points

11:06:29 21    that came up in counsel's presentation.  The first one

11:06:36 22    counsel began, again, by talking about cause of action.  And

11:06:39 23    I think it's clear that our position, our position is that

11:06:43 24    it's not whether there's a cause of action.  It's whether

11:06:46 25    there's a justiciable cause of action within the meaning of

11:06:50  1    Rule B as interpreted by these various American law cases,

11:06:55  2    which we'll encounter, has to be justiciable, not simply the

11:06:59  3    cause of action.

11:07:00  4              Counsel mentioned that they have laid down money

11:07:06  5    in London for arbitrators' fees.  Two points with that.

11:07:13  6              One, I assume -- I believe that's subject to the

11:07:18  7    event the --

11:07:20  8              THE COURT:  In other words, that's contingent,

11:07:21  9    too, because that's only if they win.

11:07:24 10              MR. REILLY:  Exactly.

11:07:25 11              THE COURT:  If they lose, then presumably you

11:07:27 12    get arbitrators' fees.

11:07:28 13              MR. REILLY:  Exactly.  And that makes my second

11:07:30 14    point maybe seem a little bit meaningless, but our position

11:07:36 15    is that what's alleged in the Verified Complaint is gone.

11:07:38 16    What counts now is the First Amended Complaint.

11:07:43 17    Allegations, if they're not contained in the First Amended

11:07:47 18    Complaint, Plaintiff has abandoned them, right, if they are

11:07:51 19    not contained in the First Amended Complaint.

11:07:52 20              We have case law on that, and I don't see

11:07:55 21    anything in the First Amended Complaint about the $500,000,

11:07:59 22    the arbitrators' fees, so, I mention that.  We also have a

11:08:02 23    contingencies fee argument.

11:08:05 24              You know, counsel is making the argument that,

11:08:12 25    Okay, maybe there's a claim against Mosaic.  In other words,

11:08:17 1    maybe we have an interest in Mosaic money.

11:08:20 2              And I think he's saying maybe we have an

11:08:23 3    interest in whether our parent has anything.  So, we have

11:08:27 4    standing.  I think he's conceding we have standing.  I don't

11:08:30 5    mean to -- I think he conceded that we have standing on

11:08:33 6    those.

11:08:33 7              A third one that falls in that category is the

11:08:36 8    first garnishee mentioned in the First Amended Complaint

11:08:41 9    when the complainant alleges against various, I think it's

11:08:47 10   17, various garnishees.  And I think the very first one is

11:08:53 11   in respect to a claim that ADMI is litigating in Louisiana

11:08:58 12   against two of the named garnishees.

11:09:01 13             So, Plaintiff, Bunge, is saying, Look, they've

11:09:06 14   got those claims against those two people in -- those two

11:09:12 15   garnishees.  And we can't attach that.  No.  That's not a

11:09:19 16   Rule B.  And Rule B(3) talks about credits, and their case

11:09:25 17   law is on this, talks about credits, and debts and effects.

11:09:30 18   That's what he gets to attach.  So, if there's a credit, and

11:09:34 19   there's a debt, and there's an effect, which I assume means

11:09:38 20   is a piece of property.  Even if everything else lined up,

11:09:43 21   they would not be able, they would not have a right to

11:09:46 22   attach whatever interest we have.

11:09:52 23             We have some interest.  We have a lawsuit going

11:09:55 24   on down in Louisiana, and we think it's a valid suit.  We

11:09:58 25   think some day we're going to collect on that, but we're not

11:10:01  1    there yet.

11:10:03  2              So, we have a right to vacate that as well.

11:10:06  3    Clearly, we have an interest, but it can't be attached.

11:10:11  4              So, and the same thing really goes with the

11:10:13  5    other three, who I've mentioned the three, the other two

11:10:18  6    garnishees.  He's asking to attach our property or our

11:10:23  7    interests, and we're saying we do not have -- you have not

11:10:27  8    identified it sufficiently as something you could attach.

11:10:30  9    But, of course, we have -- if it's ours, we have an interest

11:10:33 10    in it by definition.  So, that's my point about litigation

11:10:38 11    in Louisiana.

11:10:39 12              Counsel did mention a point that I forgot to

11:10:42 13    mention which is about these ICAs, the Inter-Club

11:10:48 14    Agreements.  And I think they've varied over the years, I

11:10:52 15    think according to statements that we have.  The way it

11:10:55 16    works now is lawsuits brought, let's say, in the United

11:11:00 17    States against the owner and the charter, I mean, they both

11:11:03 18    could have damaged the cargo.  It's brought by cargo.  So,

11:11:06 19    they both could have damaged it.

11:11:08 20              They're not jointly and severally liable, but

11:11:11 21    they could both be liable and individually.  And each of

11:11:14 22    those entities almost certainly are members of these

11:11:20 23    insurance clubs that some are in Norway, some are in London.

11:11:24 24    And those insurance clubs, I'll call them insurance clubs,

11:11:30 25    they're P&I clubs, Protection & Indemnity Clubs, but those

11:11:33  1   clubs have entered an agreement that say, Look, in these

11:11:36  2   cases where the Charter and the owner are sued, we're not

11:11:40  3   going to fight among ourselves for good strategic reasons.

11:11:45  4   And what we'll do is we'll see what happens.  And if there's

11:11:51  5   a judgment for the Plaintiff, in some circumstances, one,

11:11:55  6   either the owner will try to pay a hundred percent or, in

11:11:59  7   some circumstances, they'll divide it 50-50.

11:12:01  8          And I think it used to be the case in some

11:12:03  9   circumstances, we'll arbitrate amongst ourselves here in

11:12:06 10   London, but we're not going to.  That is relevant here.  You

11:12:09 11   know, we cited those cases, and they came back and they

11:12:13 12   said, Look, that's where there's a consensual contractual

11:12:16 13   obligation to hold off.  There's a commitment to hold off

11:12:22 14   until we've sorted out -- it's the same thing here,

11:12:27 15   certainly, with respect to the, I'll say, $480,000 claim.

11:12:32 16   We've talked about that.

11:12:34 17          But with all the claims, they are holding off

11:12:37 18   because, first, they called them -- they're going to fight

11:12:40 19   with the -- they're going to fight it out with the owners.

11:12:44 20   And then depending on how that goes, they're going to fight

11:12:48 21   it out with us.

11:12:49 22          So, those Inter-Club Agreement cases are very

11:12:53 23   relevant by analogy at least.  And I would put that forward.

11:12:59 24          Another point, when counsel is talking about,

11:13:03 25   you know, we haven't advised him whether or not these hold

11:13:09 1    anything, we're not the garnishees.  But the cases

11:13:13 2    specifically say the maritime Plaintiff availing itself of

11:13:20 3    Rule B attachment is not supposed to go on a fishing

11:13:22 4    expedition.

11:13:23 5         This is not a fishing expedition.  They serve

11:13:27 6    the garnishee.  They say -- it should say any debts, credits

11:13:32 7    or effects, and that's it.  So, we're not allowed to go on

11:13:40 8    fishing expeditions.

11:13:41 9         You asked -- Your Honor asked some questions

11:13:43 10   about whether the case would stay alive.  And my analysis is

11:13:47 11   this, it's a jurisdictional issue.  So Rule B purports --

11:13:52 12   again, it's been held as Constitutional.  Rule B is strange.

11:13:55 13   It says, it's giving the Court inpersonam jurisdiction to an

11:14:01 14   extent, not really personam jurisdiction because it's only

11:14:05 15   jurisdiction up to the value of what's garnished.  And it

11:14:10 16   has jurisdiction over the res in a way, even though it's not

11:14:16 17   an in rem proceeding.  It's a quasi in rem proceeding that

11:14:22 18   gives limited inpersonam jurisdiction.  But if there's no

11:14:26 19   Rule B attachment, there's no jurisdiction in this Court

11:14:31 20   regarding a dispute between these two Swiss entities arising

11:14:36 21   out of contracts that call for English law.  So, there would

11:14:41 22   be no jurisdiction.

11:14:44 23        And in our motion to vacate, we did ask for a

11:14:50 24   dismissal.  It was in the motion.  The maritime attachment

11:14:53 25   should be vacated, and the case should be dismissed.  That

11:14:56 1    was just in our prayer.  We didn't elaborate because there

11:15:01 2    would be no jurisdiction.

11:15:03 3            The final point, and I'm not sure of the answer,

11:15:10 4    but counsel keeps on referring to the Federal Arbitration

11:15:14 5    Act.  And I'm certainly aware, it commences with the

11:15:18 6    statement that you can even begin an arbitration with --

11:15:23 7    even if you were, and you know that, you could seek

11:15:25 8    securities.

11:15:26 9            But that's the Federal Arbitration Act.  I'm not

11:15:28 10   sure that that reaches out to arbitrations that are going on

11:15:31 11   in London or gives the -- and in any event, it does not give

11:15:38 12   the plaintiff any -- it just says if you have a right to

11:15:43 13   security, then go get it.

11:15:44 14           So, you come back to Rule B.  It doesn't give

11:15:47 15   the Plaintiff any more rights to get an attachment than Rule

11:15:51 16   B or if there's some other statute that's relevant we give.

11:15:54 17   So, in and of itself, the Federal Arbitration Act doesn't

11:15:58 18   give anymore rights to get an attachment then would exist

11:16:02 19   otherwise.  And am I'm not sure it's relevant here, and

11:16:05 20   that's my final point.

11:16:07 21           THE COURT:  All right.  Thank you, Mr. Reilly.

11:16:37 22           All right.  So, I think it's agreed, though it

11:16:46 23   was contested in the briefing, that ADMI does have standing

11:16:55 24   to challenge the garnishment relating to Mosaic based on the

11:17:01 25   representations that have been made here today.  And if I

11:17:09 1    thought I had to decide it, I probably would conclude that

11:17:13 2    there's standing in regard to the other writs, also, but I

11:17:18 3    don't think I actually have to decide it based on what

11:17:22 4    Mr. Simms said about essentially that Bunge recognizes that

11:17:34 5    whatever happens in regards to the Mosaic attachment or

11:17:38 6    garnishment would apply to the other ones if there was

11:17:43 7    something actually there to garnish.

11:17:45 8         And I would say some of the opinions I read,

11:17:48 9    maybe all the opinions I read seem to actually have some

11:17:52 10   actual thing that had been seized.  So, even though it makes

11:17:55 11   a certain amount of logical sense to me that if Bunge can

11:17:59 12   get an order seizing things that belong to ADM, ADM ought to

11:18:05 13   be able to challenge them without waiting for them to be

11:18:07 14   seized.  I don't think I really have to decide that.

11:18:11 15        So, the issue that the parties have concentrated

11:18:16 16   on this morning, which I thought was the main issue in the

11:18:19 17   case is whether or not there is a valid prima facie maritime

11:18:27 18   claim as is required by the supplemental admiralty rule

11:18:37 19   that's at issue here.  ADMI cites various cases in its

11:18:44 20   briefing for the proposition that a contingent indemnity

11:18:49 21   claim is not a prima facie valid admiralty claim.  For

11:18:54 22   example, *DHL vs. Newlead* which is at 2016 Westlaw 6885650

11:19:07 23   *5, which is from the Southern District of Georgia decided

11:19:11 24   November 18th of 2016 where the Court said, and I'm leaving

11:19:21 25   out the citation to authority, "Fatal to the attachment at

11:19:28 1   issue is that attachment under Rule B is not available to

11:19:33 2   obtain security for prospective contingent indemnity claims.

11:19:39 3   This is because an action for indemnity is not ripe until

11:19:42 4   there's been either a determination of liability or a

11:19:45 5   settlement that establishes the purported indemnitor's

11:19:51 6   obligation to pay."

11:19:56 7           The ADM also cites Bottiglieri di na Vigazone,

11:20:06 8   I'll spell that for you later, vs. Tradeline, 472 F. Supp.

11:20:14 9   2d 588 at 591 which is the Southern District of New York

11:20:17 10  case from 2007, which was affirmed by the Second Circuit

11:20:23 11  which I think said in the course of the affirmation that it

11:20:26 12  was adopting the opinion or incorporating the opinion or

11:20:30 13  something where it did more than just say affirmed

11:20:35 14  indicating that it agreed with the analysis of the District

11:20:37 15  Court.

11:20:38 16          And in that one, the District Court said this

11:20:47 17  claim for indemnity is not ripe under English law.

11:20:50 18  Plaintiff does not establish the "valid prima facie

11:20:55 19  admiralty claim" required under certain sections of Circuit

11:21:02 20  law.

11:21:03 21          And then I also have, which I don't think

11:21:07 22  anybody cited, a case called *Pacific Gulf Shipping vs.*

11:21:13 23  *Adamastos Shipping* 2019 Westlaw, 13043041 *2 which is a

11:21:21 24  Southern District of Texas case from March 13th of 2019

11:21:27 25  where the Court said at various places, "Courts have

11:21:35 1     generally held that a Plaintiff's unripe indemnity claim is

11:21:38 2     not qualified as a valid prima facie admiralty claim against

11:21:44 3     the Defendant."

11:21:44 4            And later, "Like the Plaintiff in Bottiglieri,

11:21:51 5     Plaintiff asserts an indemnity claim against Defendant which

11:21:55 6     purports to serve as the basis for attachment when Plaintiff

11:21:58 7     has yet to incur liability to the third party."

11:22:07 8            In the briefing, Bunge in its only brief, which

11:22:11 9     is Docket Item 33, cites no cases holding to the contrary.

11:22:19 10    Instead, they rely on the declaration of an English lawyer.

11:22:27 11    And Bunge doesn't in its brief respond at all to the *DHL vs.*

11:22:37 12    *Newlead* case or the Bottiglieri case, both of which were

11:22:42 13    cited by ADMI in the motion which was Docket Item 21.  And,

11:22:46 14    again, in the supplemental motion Docket Item 32, both of

11:22:50 15    which preceded the filing of Bunge's brief.

11:22:56 16           There's also been talk today of, and there was

11:23:00 17    in the briefing of the claim for more than $400,000.  It's

11:23:16 18    not an indemnity claim, but it is a contingent claim because

11:23:21 19    the arbitration complaint, which is quoted in one of the

11:23:27 20    lawyer's declarations says that it's only going to come to

11:23:33 21    life if Bunge doesn't get relief in the suit against, I

11:23:45 22    believe, what is the vessel owner.

11:23:49 23           And then today, and I don't know whether this

11:23:52 24    was in the briefing or not, but I hadn't really noticed it

11:23:55 25    in the briefing, Bunge also says, Well, we're asking for

11:24:02 1   $500,000 of attorneys' fees, and that's a contingent claim,

11:24:07 2   too, because, obviously, that depends on who wins in the

11:24:11 3   arbitration.

11:24:12 4          So, all the claims that Bunge is making are

11:24:19 5   contingent.  And that's where I think there's some

11:24:26 6   intersection between American law where the judges who have

11:24:32 7   generally dismissed these kinds of claims have said they are

11:24:35 8   not ripe, which sounds like an American law concept not an

11:24:40 9   English law concept.  And it's because they are contingent.

11:24:45 10          So, I agree with these other American judges who

11:24:51 11  have decided this, and I don't think Mr. Sarll's declaration

11:25:06 12  purports or does, in any way that I accept, help me

11:25:21 13  understand what I'm supposed to do under the supplemental

11:25:26 14  admiralty rule that's at issue here.  So, I don't think the

11:25:37 15  garnishment of Mosaic is a prima facie valid admiralty claim

11:25:43 16  so; therefore, I'm going to vacate that garnishment.

11:25:51 17          There was also an argument in the briefing which

11:26:02 18  has not been addressed this morning about an argument that

11:26:14 19  Mr. Reilly hasn't made, as I said this morning, which had to

11:26:19 20  do with the idea that I could reject the garnishment based

11:26:26 21  on the fact that ADMI is a subsidiary of a Fortune30

11:26:34 22  company, but I think the cases that he relied on were

11:26:39 23  basically overruled.  They were all Southern District of New

11:26:43 24  York cases, and they were overruled in Aqua Stoli, as stated

11:26:50 25  or analyzed in *Mediterranea Di Navigazione Spa vs.*

11:26:57 1    *International Petrochemical Group S.A.* 2007 Westlaw 1434985

11:27:05 2    at *3, Southern District of New York May 15th of 2007.

11:27:10 3            So, while my instinct is that this case ought to

11:27:19 4    be just dismissed, I think the better thing to do, since I

11:27:23 5    don't actually have to do that today, is I will just enter

11:27:28 6    the limited Order vacating the garnishment as to Mosaic.  I

11:27:33 7    would ask the parties to meet and confer and report with

11:27:37 8    some kind of joint status report in ten days how they want

11:27:41 9    to proceed.  If they want to proceed by filing motions and

11:27:46 10   filing more briefing, they can agree to that.  But if they

11:27:50 11   do, then I would actually ask them to put some time into the

11:27:54 12   briefing.

11:27:58 13           I sort of have the impression that I'm just

11:28:00 14   getting recycled briefs from things you've filed in other

11:28:03 15   places.  And in particular, the ADM brief was, at a minimum,

11:28:15 16   not cite checked, and it took me more time than it should to

11:28:21 17   try to find the cases it thought it was citing to me.

11:28:26 18           Is there anything else I need to address this

11:28:30 19   morning, Mr. Simms?

11:28:31 20           MR. SIMMS:  And so with the Court's ruling,

11:28:41 21   we're not going to require any response to the further writ

11:28:45 22   served or anything like that.  So, yeah, housekeeping, we

11:28:51 23   tried to file Mr. Sarll's declaration as supplemental this

11:28:55 24   morning.

11:28:56 25           THE COURT:  I read it.

11:28:56  1              MR. SIMMS:  And may we have the Court's

11:28:59  2      permission to put it on the record?

11:29:02  3              THE COURT:  It's on the record.

11:29:04  4              MR. SIMMS:  But it wasn't filed.

11:29:07  5              MR. HOUSEAL:  It got rejected, Your Honor.

11:29:08  6              THE COURT:  Oh, I didn't know that.  Why did it

11:29:11  7      get rejected?

11:29:12  8              MR. HOUSEAL:  Because the system treats it as a

11:29:15  9      sur-reply, and we didn't have permission to file a

11:29:19 10      sur-reply, even though it's just a declaration.

11:29:21 11              THE COURT:  Okay.  Well, I did wonder about, you

11:29:24 12      know, filing something the morning, I don't know when

11:29:28 13      exactly it was filed, but I saw it at about nine o'clock,

11:29:32 14      you know, for a ten o'clock hearing.  So, it didn't exactly

11:29:40 15      make my day.  But, in any event, I'm perfectly happy to give

11:29:49 16      you oral permission to refile it.  And if you need to do

11:29:54 17      something to make that happen -- hold on a second.

11:30:01 18              (Discussion held off the stenographic record:)

11:30:17 19              THE COURT:  All right.  Well, I'll direct the

11:30:21 20      clerk to accept the thing for filing.  If it turns out

11:30:27 21      there's more paperwork that's needed, I'm sure you'll

11:30:30 22      provide the paperwork.  But consider it part of the record.

11:30:33 23      I didn't know it wasn't part of the record, because I'm not

11:30:36 24      the one who rejects the filings.

11:30:39 25              Anything else?

| | | |
|---|---|---|
| 11:30:40 | 1 | MR. SIMMS:  No, Your Honor. |
| 11:30:40 | 2 | THE COURT:  Okay.  Mr. Reilly, anything from |
| 11:30:42 | 3 | you? |
| 11:30:45 | 4 | MR. REILLY:  No, Your Honor. |
| 11:30:46 | 5 | THE COURT:  Okay.  Well, thank you very much. |
| 11:30:47 | 6 | This is a pleasant change from what I spend most of my time |
| 11:30:55 | 7 | doing, but it's also a challenge because it is not what I |
| 11:30:59 | 8 | spend most of my time doing. |
| 11:31:01 | 9 | Am I going to see you this afternoon, Mr. Simms? |
| 11:31:03 | 10 | MR. SIMMS:  Yes, sir. |
| 11:31:04 | 11 | THE COURT:  All right.  A two for. |
| 11:31:06 | 12 | All right.  We'll be in recess. |
| 11:31:08 | 13 | DEPUTY CLERK:  All rise. |
| | 14 | (Court was recessed at 11:31 a.m.) |
| | 15 | I hereby certify the foregoing is a true and |
| | 16 | accurate transcript from my stenographic notes in the |
| | 17 | proceeding. |
| | 18 | /s/ Heather M. Triozzi |
| | | Certified Merit and Real-Time Reporter |
| | 19 | U.S. District Court |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |